IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,       ) | |
| ) | 8:08CR356 |
| Plaintiff,       ) | |
| ) | REPORT AND |
| vs.       ) | |
| ) | RECOMMENDATION |
| MARK DORSETT,       ) | |
| ) | |
| Defendant.       ) | |

  This matter is before the court on a motion to suppress (Filing No. 25) and a motion to dismiss (Filing No. 27) filed by Mark Dorsett (Dorsett).  Dorsett is charged in the Indictment with the possession with intent to distribute more than 50 grams of methamphetamine on July 17, 2007, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) (Count 1); possessing a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count II); and forfeiture of a firearm under 18 U.S.C. § 924(d) and 28 U.S.C. § 2461 (Count III).  **See** Filing No. 29 - Superseding Indictment.  Dorsett seeks to suppress all evidence derived from the search and seizure of his vehicle after his arrest on July 17, 2007.  Additionally, Dorsett seeks to dismiss the Indictment based on a conditional agreement not to prosecute.  The defendant filed a brief (Filing No. 26) in support of the motion to suppress and a brief (Filing No. 36) in support of the motion to dismiss.  The government filed a brief (Filing No. 35) in opposition to the motion to suppress.

  An evidentiary hearing was held on Dorsett's motions on April 2, 2009.  Dorsett was present for the hearing along with his counsel, Glenn A. Shapiro.  The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda.  The court heard testimony from the following witnesses:  Omaha Police Department (OPD) Narcotics Officer Gary Kula (Officer Kula); OPD Sergeant Jonathan Waller (Sergeant Waller); Shawn Hagerty (Mr. Hagerty), an attorney for the County Attorney's Office in Douglas County, Nebraska; and Mark Lang (Investigator Lang), a former narcotics officer with the OPD.  The court received into evidence the following exhibits:  an affidavit and application for a search warrant (Exhibit 1); a search warrant and a receipt and inventory dated July 18, 2007 (Exhibit 2); a receipt and inventory dated July 17, 2007 (Exhibit 101); a copy of Nebraska Revised

Statute § 28-1201 (Exhibit 102); and a note regarding a non-prosecution agreement (Exhibit 103). A transcript (TR.) of the hearing was filed on April 13, 2009 (Filing No. 45). On April 27, 2009, the government filed a post-hearing brief (Filing No. 48). The defendant filed a post-hearing brief on May 4, 2009 (Filing No. 49), whereupon the matter was deemed submitted.

## FINDINGS OF FACT

Investigator Lang, currently a criminal investigator with the Douglas County Attorney's Office, was an officer with the OPD narcotics unit until his retirement on December 14, 2007 (TR. 41; Ex. 1 p. 1). On July 17, 2007, in his capacity as an OPD narcotics officer, Investigator Lang received information from a confidential informant that a party known as "Mejia" distributed methamphetamine and resided at 3603 Burdette Street (Ex. 1 p. 1). Investigator Lang began surveillance at the residence on July 17, 2007 (Ex. 1 p. 2). Investigator Lang observed the party known as "Mejia" leave the residence (Ex. 1 p. 2). Shortly thereafter officers stopped the vehicle and seized one-and-one-half pounds of methamphetamine (Ex. 1 p. 2). The driver was identified as Jose Antonio Mejia-Pacheco (Mejia) (Ex. 1 p. 2). Mejia gave the officers permission to search his residence (Ex. 1 p. 2). After Mejia's arrest, officers continued surveillance of the residence (Ex. 1 p. 2). A white 1999 Ford Econoline van arrived and parked in front of the residence (Ex. 1 p. 2). A white male, identified later as Dorsett, exited the van and entered the residence (Ex. 1 p. 2). Five minutes after entering the residence, Dorsett returned to the van and retrieved a small dark duffel bag and reentered the residence (Ex. 1 p. 2). After twenty minutes Dorsett exited the residence with the duffel bag and placed the duffel bag in the van on the passenger side (Ex. 1 pp. 2-3). Dorsett then returned to the front lawn of the residence and made contact with two males (Ex. 1 p. 3).

Narcotics officers, including Investigator Lang and Officer Kula, approached Dorsett and the two males (Ex. 1 p. 3). Officer Kula, has served with the OPD for fourteen years, nine of which were as a narcotics officer (TR. 12). Currently, Officer Kula is a polygraph examiner for the City of Omaha (TR. 12). Officer Kula informed Dorsett the officers and he (Officer Kula) were at the address conducting a narcotics investigation and would like

permission to search Dorsett for weapons (TR. 14). Dorsett immediately responded by stating he was carrying knives (TR. 14). Officer Kula placed Dorsett in handcuffs to retrieve the knives from Dorsett (TR. 14). Dorsett indicated where the knives were located and Officer Kula retrieved a knife contained in a sheath from Dorsett's waistband and a small folding knife from Dorsett's front pants pocket (TR. 14; Ex. 101). The knife in the sheath was a 3-inch, Benchmade spring action folding knife (TR. 16; Ex. 101). The small knife in the front pocket was a 2-inch, Chinese silver folding knife (TR. 16; Ex. 101). The officers did not ticket Dorsett, but placed him under arrest for possessing concealed weapons (TR. 17).

The officers asked Dorsett for permission to search his vehicle after Dorsett identified the van to be his (Ex. 1 p. 3). Dorsett declined to give the officers permission to search his van (Ex. 1 p. 3). Dorsett was very nervous, sweating profusely, and did not make eye contact with the officers (Ex. 1 p. 3). Due to Dorsett's demeanor and his suspicious activity at a residence affiliated with narcotics, Investigator Lang and Officer Kula impounded the van for further investigation (Ex. 1 p. 3). On July 18, 2007, Officer Kula, with his narcotics detection canine, General, went to the impound lot to complete an investigation of the van (Ex. 1 p. 3). During an exterior sniff of the van, General alerted to the odor of illegal narcotics by scratching near the passenger side door of the van where Dorsett had placed the duffel bag after leaving the residence (Ex. 1 p. 3). Based on the above information, Investigator Lang and Officer Kula sought a search warrant before entering the van (Ex. 2). The search warrant was issued (Ex. 2). On July 18, 2007, Officer Kula conducted a search of Dorsett's van and seized drugs, drug paraphernalia, money, a firearm, and ammunition (Ex. 2).

After Dorsett's arrest, Mr. Shapiro, attorney for Dorsett, contacted Ms. Svoboda, attorney for the United States, in an attempt to prevent Dorsett's federal indictment (TR. 43). Ms. Svoboda informed Investigator Lang that Mr. Shapiro indicated Dorsett wanted to cooperate with law enforcement (TR. 42). Ms. Svoboda sent a note, on November 2, 2007, to Mr. Shapiro concerning Dorsett's arrest and possible cooperation with law enforcement (TR. 44; Ex. 103). The note states, in its entirety:

> Lang arrested Dorsett w/ ½ # of meth. State charges filed.

3

> Lang & I have agreed Dorsett will "work" for Lang. As long as Dorsett is "good," I won't file fed charges against him, re: that ½ #.

**See** Ex. 103. Investigator Lang contacted Dorsett concerning his possible cooperation (TR. 42; 57). Dorsett agreed to cooperate with Investigator Lang (TR. 44-45).

Investigator Lang and Officer Bob Laney (Officer Laney) met with Dorsett to determine his potential in cooperating with law enforcement (TR. 58). Investigator Lang focused on making methamphetamine arrests but was open to information regarding other narcotics or weapons (TR. 58-59). Investigator Lang told Dorsett he needed to provide "five good quality investigations" (TR. 61). "Good quality investigations," according to Investigator Lang, meant Dorsett's level, one-half pound of methamphetamine, or above (TR. 61). Investigator Lang based these parameters on the amount of methamphetamine Dorsett was arrested with in Nebraska and on a previous occasion in Iowa (TR. 59-60). The meeting lasted approximately fifteen to twenty minutes (TR. 62).

While cooperating with Investigator Lang, Dorsett worked to make a deal with a person named Dan Palmer (Palmer deal), which took place on October 3, 2007 (TR. 45, 63). The Palmer deal led to three arrests (TR 63-65). Investigator Lang seized eight ounces of methamphetamine from Dan Palmer, and three-point-five grams and fourteen-point-five grams of methamphetamine from two others (TR. 63-64). Although Investigator Lang seized methamphetamine and made two peripheral arrests, in terms of amounts, these seizures did not satisfy Investigator Lang's definition of "good quality investigations" (TR. 64-65). Dorsett did not provide Investigator Lang with any other transactions after the Palmer deal, and Dorsett expressed to Investigator Lang that no one would work with him (TR. 65-66). However, Investigator Lang did not believe Dorsett (TR. 66). Dorsett provided Investigator Lang with names and addresses of other individuals and cooperated with Special Agent Jim Slossen from the Bureau of Alcohol, Tobacco, Firearms and Explosives (TR. 48).

Mr. Hagerty, prosecutor from the Douglas County Attorney's Office assigned to Dorsett's case, initially filed a Class IB felony charge against Dorsett around September 2007 (TR. 22, 23, 30, 50). Following the filing of the case, but prior to November or December 2007, Mr. Shapiro and Investigator Lang informed Mr. Hagerty of Dorsett's

cooperation with the OPD (TR. 22). Although Mr. Hagerty was not aware of the details concerning Dorsett's cooperation, Mr. Hagerty knew Dorsett was cooperating to help resolve the charges against Dorsett (TR. 22, 25-26, 41). Investigator Lang informed Mr. Hagerty that Investigator Lang was pleased with the Palmer deal, which Dorsett organized, and wanted Mr. Hagerty to consider Dorsett's cooperation when negotiating a plea (TR. 71). Based on Dorsett's cooperation with law enforcement, Mr. Hagerty offered to reduce the Class IB felony charge, which is punishable for a minimum of twenty years to life imprisonment, and allow Dorsett to plead in state court to a Class II felony, which is punishable for one to fifty years imprisonment (TR. 23-25). Dorsett did not believe the reduced charge was a fair offer, and indicated he might be able to cooperate further (TR. 25). In December 2007, Dorsett's counsel filed a motion to suppress which was continued for approximately four to six months to allow time for plea negotiations (TR. 26-27, 31-32).

In the summer of 2008, Mr. Hagerty offered Dorsett an opportunity to plead to a Class III felony, which is punishable for a minimum of one to twenty years imprisonment, without a sentencing recommendation (TR. 27, 36, 72). The offer was in response to information from Investigator Lang about Dorsett's cooperation (TR. 50). However, Mr. Hagerty did not speak with any other officers concerning Dorsett's work with law enforcement (TR. 27). Mr. Hagerty indicated to Dorsett the Class III offer would be rescinded if Dorsett proceeded with the motion to suppress (TR. 32). Dorsett rejected the offer because he wanted a guarantee of probation (TR. 52-53). Additionally, Dorsett indicated he wanted to do more work with law enforcement and had something new to offer (TR. 52-53).

Investigator Lang provided Dorsett with information to contact Officer Laney and Sergeant Waller since Investigator Lang would no longer be able to work with Dorsett (TR. 26, 49-50, 53). In August 2008, Sergeant Waller met with Dorsett to discuss Dorsett's ability to purchase narcotics (TR. 53, 79-80). Officer Laney and Sergeant Waller met with Dorsett for approximately an hour-and-a-half during which Dorsett identified residences and informed the officers of people who sold narcotics (TR. 90). Sergeant Waller asked Dorsett to purchase as large a quantity of narcotics as possible which could lead to felony

arrests or federal indictments (TR. 90). Sergeant Waller did not specify a minimum required amount of narcotics to be purchased (TR. 90).

Dorsett organized four transactions while working with Sergeant Waller (TR. 80-87). The first transaction was unsuccessful (TR. 80). In the second transaction, Dorsett led Sergeant Waller to a source of narcotics and a subsequent arrest was made related to an ounce of powder cocaine (TR. 81-82, 87). The third transaction led to two arrests, one of which was a possible source, and seizure of one-half ounce of methamphetamine from one person and point-two or point-four grams of methamphetamine from another (TR. 85-86). The fourth transaction was unsuccessful (TR. 83). However, the problems with the first and fourth transactions were not Dorsett's fault (TR. 80, 83, 97). In each transaction Dorsett wore a wire (TR. 86). Sergeant Waller was not satisfied with Dorsett's cooperation because Sergeant Waller believed Dorsett provided middlemen rather than larger distributors of narcotics with whom he had access (TR. 91). Sergeant Waller informed Mr. Hagerty, Investigator Lang, and Officer Laney of Dorsett's cooperation in approximately August 2008 (TR. 88). Investigator Lang informed Mr. Hagerty that Officer Laney and Sergeant Waller were having difficulty working with Dorsett (TR. 50).

After Dorsett rejected the Class III felony offer and indicated he could work further, Investigator Lang contacted Ms. Svoboda about Dorsett's situation (TR. 52-53, 72). An indictment was returned against Dorsett on September 16, 2008 (TR. 29). Mr. Hagerty did not have any discussion with the United States Attorney's Office concerning Dorsett's cooperation with law enforcement and dismissed the state charges upon federal indictment (TR. 38).

## LEGAL ANALYSIS

### A.  Motion to Suppress

Dorsett argues the seizure of his van, after he denied permission to search, was unlawful. Moreover, the subsequent canine sniff at the impound lot was fruit of an unlawful seizure of the van. Therefore, Dorsett asserts the affidavit and application for the search warrant (Ex. 1) contains information gathered after an unlawful seizure of the van, and

without this information, the remaining information does not rise to the level of probable cause necessary to support a search warrant (Ex. 2) for the van.

The Fourth Amendment of the Constitution provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The government has the "burden to demonstrate that the seizure it seeks to justify is on the basis of a reasonable suspicion." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Impounding a vehicle generally constitutes a seizure under the fourth amendment. **See** *United States v. Johns*, 469 U.S. 478, 484 (1985). "Police may take protective custody of a vehicle when they have arrested its occupants even if it is lawfully parked and poses no public safety hazard." *United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir. 1993); **see** *Colorado v. Bertine*, 479 U.S. 367, 375 (1987). The decision to impound must be made "according to standardized criteria" and an impoundment decision made pursuant to standardized procedures will most likely satisfy the Fourth Amendment. *Bertine*, 419 U.S. at 376. "So long as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) (**quoting** *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004)). "In the absence of standardized impoundment procedures, the decision to impound a vehicle is permissible under the Fourth Amendment as long as the impoundment is reasonable under the circumstances." *United States v. Smith*, 522 F.3d 305, 313 (8th Cir. 2008). In the alternative, probable cause is necessary to impound a vehicle for investigative purposes. *Id.* at 314 n.9. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Nolen*, 536 F.3d 834, 839 (8th Cir. 2008).

The van's seizure was legally justified by Dorsett's arrest. Dorsett was arrested for carrying two concealed knives on his person. Section 20-191 of the Municipal Code of the City of Omaha defines a weapon as "any other instrument the use of which is intended or likely to cause death or bodily injury." Municipal Code of the City of Omaha § 20-191. Moreover, Omaha Municipal Code states carrying a concealed weapon knowingly on one's

7

person is unlawful. Municipal Code of the City of Omaha § 20-192. Therefore, Dorsett was lawfully arrested for carrying two concealed knives on his person in violation of Omaha Municipal Code.

The law and circumstances permitted officers to impound Dorsett's van to place it in protective custody and for investigation based on probable cause. After the officers arrested Dorsett, he could no longer drive the van. Absent impoundment, the van would have remained, not at Dorsett's residence, but at a residence known for narcotics. Therefore the officers were justified in taking the van into protective custody.

The officers also had probable cause to impound the van. After arresting Mejia for narcotics, the officers continued surveillance of Mejia's residence and observed Dorsett enter the residence, exit and retrieve a duffel bag, reenter the residence, then exit the residence and place the duffel bag in the van. Based upon the circumstances surrounding Mejia's arrest and Dorsett's unusual conduct, Investigator Lang and Officer Kula were justified in believing Dorsett placed narcotics in the van. Furthermore, when Investigator Lang and Officer Kula spoke with Dorsett he was very nervous, sweating profusely, and failed to make eye contact with the officers. Dorsett's demeanor combined with the the officers other observations on July 17, 2008, provided the officers with an objectively reasonable suspicion that there was a fair probability contraband or evidence of a crime would be found in the duffel bag in the van. Accordingly, based on the totality of the circumstances, probable cause existed to impound the van.

After the van was impounded, Officer Kula permissibly conducted a canine sniff around the van's exterior with a certified Narcotics Detection Canine (General). "A canine sniff of a vehicle does not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). At the passenger side of the van, where Dorsett placed the duffel bag, General alerted to the odor of illegal narcotics. As Officer Kula conducted the canine sniff after the legal impoundment of Dorsett's van, the evidence of the canine sniff need not be excised from the search warrant. After General indicated narcotics were in the van, but before entering the van, Investigator Lang and Officer Kula submitted an application for a search warrant (Ex. 1).

"To be valid under the Fourth Amendment, a search warrant must be supported by a showing of probable cause." *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008) (**quoting** *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007)). "When determining whether probable cause exists, the determination must be based upon only that information within the four corners of the search warrant affidavit." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008). The judge reviewing the application "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *Wallace*, 550 F.3d at 732 (**quoting** *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

Investigator Lang and Officer Kula submitted an affidavit and application for a search warrant (Ex. 1) detailing the circumstances of Dorsett's arrest. Dorsett drove to and entered a residence affiliated with narcotics. The residence's owner had been arrested with narcotics earlier the same day. After visiting the residence, Dorsett retrieved a duffel bag from his van, took the bag into the residence, then returned the bag back to his van. Subsequent to witnessing this conduct, the officers spoke to Dorsett who was nervous and sweating profusely, and failed to make eye contact with the officers. Based on these events, the officers had an objectively reasonable suspicion the duffel bag contained narcotics. The officer's confirmed their suspicion of narcotics in the van when General alerted to the odor of illegal narcotics at the impound lot by scratching at the passenger door where Dorsett placed the duffel bag. Analyzing the totality of the circumstances as described in the four corners of the affidavit, probable cause existed to issue the search warrant. For these reasons, Dorsett's motion to suppress should be denied.

### B.     Motion to Dismiss

Dorsett argues the government violated the non-prosecution agreement made between the United States Attorney's Office and Dorsett. Specifically, Dorsett contends he met the conditions of the non-prosecution agreement by cooperating with law enforcement officers. Accordingly, he asserts the indictment should be dismissed because he was wrongfully indicted in violation of the bargained-for agreement.

"A cooperation agreement is somewhat analogous to a plea agreement except that the former is a 'prosecutorial agreement, the [in]violability of which rested completely in the province of the government prosecutors, who have the sole power and responsibility to institute criminal proceedings.'" *Johnson*, 861 F.2d at 512 (**quoting** *United States v. Minn. Mining & Mfg. Co.*, 551 F.2d 1106, 1112 (8th Cir. 1977)) (Alteration to reflect original). "Within the context of constitutional safeguards for due process, non-prosecution agreements may be enforced under principles of contract law." *United States v. Hyles*, 521 F.3d 946, 952 (8th Cir. 2008) (**citing** *United States v. Crawford*, 20 F.3d 933, 935 (8th Cir. 1994)). "With an agreement not to prosecute, parties agree that the defendant's cooperation is sufficient consideration for the government's promise of immunity." *United States v. Johnson*, 861 F.2d 510, 512 (8th Cir. 1988). "Only a material breach is sufficient to excuse the government of its performance." *Hyles*, 521 F.3d at 952 (**quoting** *Crawford*, 20 F.3d at 935).

In the non-prosecution agreement, Ms. Svoboda set forth a standard, if Dorsett was "good" then Ms. Svoboda would not indict Dorsett (Ex. 103). Investigator Lang informed Dorsett that to satisfy this standard, Dorsett needed to provide "five good quality investigations" and told Dorsett the parameters (TR. 61). While Dorsett cooperated with Investigator Lang, Dorsett provided only one qualifying transaction, the Palmer deal. Moreover, Sergeant Waller expressed his displeasure with the work Dorsett performed as the later transactions mostly involved "middlemen" rather than distributors.

Dorsett's cooperation with law enforcement was held to a high standard. Dorsett agreed to provide Investigator Lang with "five good quality investigations," which Investigator Lang defined as investigations containing at least one half-pound of methamphetamine. Dorsett knew he was required to fully cooperate with the investigators by providing five good quality investigations for the non-prosecution agreement in order to bind the government, and yet Dorsett failed to satisfy his part of the agreement. Although Dorsett did what was asked of him, to some extent, Dorsett's actions and the results, in number and quality, were not sufficient to satisfy the requirements set forth in the non-prosecution agreement. Therefore, Dorsett materially breached his duty. Due to Dorsett's

material breach of the non-prosecution agreement, the government was relieved of its duty and did not violate the agreement by indicting Dorsett.  Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON  that:**

1.Mark A. Dorsett's Motion to Suppress (Filing No. 25) be denied; and
2.Mark A. Dorsett's Motion to Dismiss (Filing No. 27) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 15th day of June, 2009.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge